# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| HEATHER SHANNON, | : | CIVIL ACTION |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : | No. 09-5220 |
|  | : |  |
| HOBART, et al., | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                    **FEBRUARY 8, 2011**

Presently before the Court is Defendants Hobart and Hobart Corporation's (collectively, "Hobert") Motion for Summary Judgment against Plaintiff Heather Shannon ("Shannon"). Hobert has also filed Motions In Limine to Exclude the Testimony and Opinions of John Bassini and to Exclude the Testimony and Opinions of Carolyn C. Uveges, Lorraine E. Buchanan, and David L. Hopkins   For the reasons set forth below, the Motions for Summary Judgment and In Limine to Exclude the Testimony and Opinions of John Bassani will be granted, and the remaining Motion In Limine denied as moot.

## I.      BACKGROUND

Shannon filed the instant action in the Philadelphia Court of Common Pleas alleging claims of negligence, product liability, and breach of warranty against Hobart.  (Compl. ¶¶ 7-40.)  This action was removed to this Court on November 10, 2009, and Shannon's Motion to Remand back to state court was denied on December 2, 2009.

This action arises out of an incident on April 4, 2007 when Shannon was working with a

commercial food mixer[1] in the kitchen at a Chuck E. Cheese restaurant in Allentown, Pennsylvania. Shannon asserts that she was training a co-worker, Arlene Rodriguez ("Rodriguez"), on how to use the mixer. She states that after they mixed the ingredients to make pizza dough in the bowl of the machine, she watched Rodriguez press the stop button, move the clutch to the off position, and turn off the timer as she had trained her to do.[2] (Def.'s Mot. Summ. J., Ex. D at 77-79.) Shannon testified that she trained Rodriguez to never touch any of the buttons or levers when someone was removing dough from the mixer. (Id. at 79.) She asserts that she then put her entire upper body, including her head, inside the mixer's bowl to remove the dough. (Id. at 86.) Shannon asserts that while head-first inside the bowl, Rodriguez turned on the mixer causing the agitator to begin rotating and strike her in the jaw and shoulders causing her serious injuries (Id. 61, 79-80.) Shannon claims that the mixer's design was defective at the time it was manufactured in 1982, and was to blame for the accident. (Pl.'s Resp. Mot. Summ. J., at 1.)

## II.    MOTION TO EXCLUDE EXPERT TESTIMONY

Hobert has challenged the admissibility of the opinion of Shannon's expert, Dr. John Bassani ("Dr. Bassani".) The admissibility of expert evidence is governed by Rule 702 of the

---

[1]The mixer was a Hobart model M-802. (Pl.'s Resp. Mot. Summ. J., Ex. A at 1.) It stood approximately 65 inches tall and 27 inches wide with an 80-quart bowl. (Id. at Ex. D, p.7.) Shannon claims that Hobart engaged in the selling, marketing, manufacturing, and design of the mixer. (Compl. ¶ 5.)

[2]The mixer's basic parts include a stand, an agitator, and a bowl. The operating controls include a start button, a clutch lever, and a timer. (Defs.' Mot. Summ. J., Ex. B at 5-6.) In order for the agitator to rotate, the start button must be pressed, the clutch lever moved to the run position, and the timer set. (Id. at Ex. C, p.7.)

Federal Rules of Evidence.[3] In order for expert evidence to be admissible, it must satisfy three requirements. Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008). First, the proffered witness must be qualified as an expert. Id. Second, the expert must testify about matters requiring scientific, technical, or specialized knowledge. Id. And third, the expert's testimony must assist the trier of fact. Id.

In assessing these three requirements, "a trial judge acts as a gatekeeper to ensure that any and all expert testimony or evidence is not only relevant, but also reliable." Pineda, at 520 F.3d 243 (citing Daubert v. Merrell Dow Pharms., 509 U.S. 579 (1993)). There is a strong preference under the Rules of Evidence for admitting any evidence that may be relevant and assist the trier of fact in reaching a decision. See Fed.R.Evid. 401 (defining "relevant evidence" as any evidence which has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). Indeed, "Rule 702, which governs the admissibility of expert testimony, has a liberal policy of admissibility." Kannankeril v. Terminix Int'l, 128 F.3d 802, 806 (3d Cir. 1997).

─────────────────────

[3]Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

(Fed.R.Evid. 702.)

**A. Qualification**

In order for an individual to be qualified as an expert, the person must "possess specialized expertise." Pineda, 520 F.3d at 244. The Third Circuit has construed "special expertise" liberally and has held that a broad range of knowledge, skills, and training can qualify an individual as an expert. See In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994). Indeed, the Third Circuit has "eschewed imposing overly rigorous requirements of expertise and [has] been satisfied with more generalized qualifications." Id.

In this case, Hobert challenges Dr. Bassani's qualifications on the basis that he possesses no experience in the area of designing or manufacturing commercial food mixers. However, Dr. Bassani's curriculum vitae indicates that he qualifies as an expert in the field of mechanical engineering. Dr. Bassani holds a Ph.D. in engineering from Harvard University, and currently serves as a Professor of Mechanical Engineering at the University of Pennsylvania. (Pl.'s Resp. Mot. Summ. J., Ex. B.) Dr. Bassani has also been a professor in the University's Mechanical Engineering and Applied Mechanics department for the last thirty years. (Id.). On the basis of these credentials, we find that Dr. Bassani is qualified as an expert in the field of mechanical engineering. However, as will be discussed infra, we find his methodology to be unreliable.

**B. Reliable Methodology**

The second consideration, whether the expert will testify about matters requiring scientific, technical, or specialized knowledge, has been interpreted to mean that "an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." Pineda, 520 F.3d at 244. An expert's opinion can be deemed reliable if it is "based on the methods and procedures of science rather than on subjective belief or unsupported

4

speculation," thereby giving an expert "good grounds" for his belief.  <u>Paoli</u>, 35 F.3d at 742.

Here, Hobert asserts that there is "absolutely no methodology underlying Bassini's opinion."  (Defs.' Mot. Limine to Exclude Opinion of John Bassini, at 3.)  Hobert argues that Dr. Bassani's lack of methodology and experience render his opinion unreliable in that he simply looked at the mixer and concluded that the mixer was defectively designed because it was not equipped with an interlocked bowl guard when it was manufactured in 1982.  The interlocked guard was designed and manufactured twelve years later in 1994 and was, subsequently, added to the mixer after this accident.  (<u>Id.</u>)

Shannon asserts that Dr. Bassani's opinions are adequately based on scientific and technical methodology.  Shannon states that Dr. Bassani spent 1 to 1 ½ hours inspecting and operating the mixer.  He turned it off and on 15 to 20 times, moved the various levers, raised and lowered the bowl, and changed the speed.  (Bassani Dep. at 25-26.)  Shannon states further that Dr. Bassani reviewed the Complaint and other Court documents including depositions and answers to interrogatories in arriving at his conclusions.  (Pl.'s Resp. Mot. Summ. J., Ex. A at 1.)  In addition, Shannon argues that in his report, Dr. Bassani called upon his own knowledge and experience, and drew upon resources such as the American Society of Mechanical Engineers ("ASME") Code of Ethics of Engineers which dictates that safety be the "first and foremost consideration for any engineering design."  (<u>Id.</u>)  Shannon adds that Dr. Bassani then applied the engineering principles found in the Accident Prevention Manual of the National Safety Council and other "related books and peer reviewed publications" to arrive at five priorities of

requirements for an engineering design.[4]  (Id.)

Dr. Bassani stated in his report that he applied these criteria to the facts before him and arrived at the conclusion that the danger of someone being hurt in this case was not eliminated through the basic design of the machine.  (Id.)  He opined that a "guard with an interlocking device to stop the agitator from moving when the guard was open" was required to eliminate the defect.  (Id. at 2.)  Dr. Bassani also noted that such a guard was installed on the mixer after Shannon was injured and that "without such a bowl guard, the [M] –802 mixer was an unsafe

---

[4]Dr. Bassani stated in his report that these priories are:

> 1.  The highest priority in safe product design is to eliminate the hazard.  If the hazard is completely eliminated through design, there is no need to address lower priorities;

> 2.  The second best solution to problems associated with a potentially dangerous product is to neutralize the hazard with fixed guards, automatic-stop devices, or other protective safety devices. The hazard remains, but user behavior modification is not required;

> 3.  Warnings are the third priority.  If the hazard cannot be completely designed away or guarded against, warnings are the next option;

> 4.  Next in the hierarchy of hazard removal is the development and implementation of operational procedures and employee training programs; and

> 5.  When all else fails, product users are given protective equipment, clothing, and shielding to increase safety in certain situations.

(Id. at 2.)

design and posed hazards to the user."[5]  (Id. at 1.)  Dr. Bassani also expressed the opinion that the

mixer was defective since "it did not have the proper warning and instruction concerning its use."

(Id. at 3.)

The Third Circuit has suggested the following list of factors that the trial judge may

consider in determining reliability:  (1) whether a method consists of a testable hypothesis; (2)

whether the method has been subject to peer review; (3) the known or potential rate of error; (4)

the existence and maintenance of standards controlling the technique's operation; (5) whether the

method is generally accepted; (6) the relationship of the technique to methods which have been

established to be reliable; (7) the qualifications of the expert witness testifying based on the

methodology; and (8) the non-judicial uses to which the method has been put.  Pineda, 520 F.3d

at 248 (citing Paoli, 35 F.3d at 742 n. 8).  These factors, however, are not exclusive, nor do they

---

[5]Dr. Bassani stated in his report:

> Guards and interlocking switches are a generally recognized
> method of restricting machine movements and possible injury to
> operators.  Designs with such components are not a new concept
> and, in fact, have been recognized for years prior to the
> manufacture and design of the subject mixer.  The subject mixer, at
> the time of the design and manufacture, should have had a safety
> interlock bowl guard that would have prevented operation when
> the guard was in an open position.  The guard could have been
> easily designed and fabricated to add protection to the mixing
> operation.  One obvious design, given the configuration of the
> Hobert M-802 agitator and bowl, is a two-piece guard with a front
> portion that rotates inside the rear portion and with an interlocking
> switch that requires the guard to be in a closed position before the
> mixer can operate.  Such a guard could have been readily designed
> for ease in use to add or remove ingredients and to connect or
> remove agitators.  The front portion could easily be detached for
> cleaning and the rear portion could be easily cleaned in position.

(Id.at 2.)

apply to all cases.  Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999).  Rather, the

test of reliability is flexible, it "grants a district court the same broad latitude when it decides how

to determine reliability as it enjoys in respect to its ultimate reliability determination."  Id. at 142.

To the extent applicable, these factors will guide our consideration of whether Dr. Bassani's

proposed testimony is reliable and would assist the fact-finder.  Pineda, 520 F.3d at 244.

Since an expert's "conclusions and methodology are not entirely distinct from one

another," Montgomery County v. Microvote Corp., 320 F.3d 440, 448 (3d Cir. 2003), a "court

may conclude that there is simply too great a gap between the data and the opinion proffered,"

General Electric v. Joiner, 522 U.S. 136, 146 (1997).  Such is the case here.  In considering

several of the factors above, we find that Dr. Bassani's methodology was not reliable and will

exclude his opinion from evidence.

As noted, an expert's opinion cannot be based on unsupported speculation.  Paoli, 35

F.3d at 742.  The case of Oddi v. Ford Motor Company is instructive.  See 234 F.3d 136 (3d Cir.

2000).  In Oddi, the Court of Appeals in finding the expert's methodology unreliable placed great

emphasis on the fact that the expert never tested his hypotheses, never calculated the force

inflicted on the truck that had been involved in the crash, and never measured the strength of the

guardrail involved.  234 F.3d at 158.  Instead, the expert simply examined the damaged truck and

concluded it could have been designed more safely.  The Court noted that the expert's opinion

was "based on nothing more than his training and years of experience as an engineer," and was

therefore "*ipse dixit.*"[6]  Id.  The Court added that there was nothing in the expert's opinion to

_____

[6]*Ipse dixit* is defined as "a bare assertion resting on the authority of an individual."
Black's Law Dictionary 828 (6th ed.1990).

submit to peer review, and it was impossible to ascertain any rate of error for the expert's assumptions.  Id.  The Court further stated that no standards controlled the expert's analysis, and no "gatekeeper" could assess the relationship of the expert's method to other methods known to be reliable and the non-judicial uses to which they had been put.  Id.; see also Meadows v. Anchor Longwall and Rebuild, Inc., 306 Fed. Appx. 781 (3d Cir. 2009) (affirming the exclusion of testimony where the expert not only "did not attempt to replicate the conditions . . .  at the time of the accident" but also gave "no reference to material, publication or literature describing the failure scenario," presented "no evidence that his methodology was subjected to peer review or that it is generally accepted," cited to "no outside documentary evidence," and presented the court with "no evidence concerning any known or potential error rates in his testing[ ] and no control standards");  Johnson v. SJP Mgmt. LLC, No. 07-5545, 2009 WL 367539, at * 13 (E.D. Pa. Feb.12, 2009) (rejecting an opinion that "appear[ed] to be based more on an instinctive reaction to the materials . . . provided than on any testable hypothesis"); Booth v. Black & Decker, Inc., 166 F. Supp. 2d 215, 221 (E.D. Pa. 2001) (excluding the testimony of an expert who "performed no tests of his own to determine whether his hypotheses were indeed true" but rather "merely examined the [allegedly defective] toaster oven and concluded it could have been safer"); Hamilton v. Emerson Elec. Co., 133 F. Supp. 2d 360, 372 (M.D. Pa.  2001) (rejecting the testimony of an expert who reached the "conclusion that the [miter] saw was defective . . . based only on his own authority").

　　　　As noted above, Dr. Bassani spent time physically examining the mixer.  In his report, he states that his opinion that the mixer was defective as designed was based on such examination, his own knowledge and experience, resources such as the ASME, and applied engineering

principles found in the Accident Prevention Manual of the National Safety Council. However, just as with the expert in <u>Oddi</u>, it is apparent that Dr. Bassani merely examined the mixer and concluded it could have been safer because a guard could have been designed and fabricated back in 1982. Having carefully reviewed Dr. Bassani's expert report and deposition transcript, we find his inquiry into whether the mixer was defective to be speculative and haphazard, his methodology to be unreliable, and, consequently, his conclusions to be suspect. Dr. Bassani produced no persuasive, objective evidence that his method was subject to peer review, had a known or potential rate of error, could be measured against existing standards, or was generally accepted, as required by Rule 702.

Dr. Bassini's opinion is simply not based on any reliable methodology, but rather based on his own speculation that a guard could have been designed and fabricated back in 1982. He offers no publications or any other evidence from the food industry or elsewhere that such a guard was feasible or used on other similar machines back in 1982. His deposition testimony indicates that he had never designed any commercial food equipment, manufactured any commercial food equipment, worked for a commercial food manufacturer, or published any articles on the design or manufacture of commercial food equipment. (Bassani Dep. 32-34.) In addition, Dr. Bassini has never even been involved in a case involving commercial food equipment and had no prior opinions regarding commercial mixers prior to this case. (<u>Id.</u> at 21, 65.) Moreover, Dr. Bassani had never even operated a commercial food mixer before the day he inspected the mixer involved in this litigation, nor did he even attempt to familiarize himself with commercial mixers or food equipment. (<u>Id.</u> at 24, 27.)

Dr. Bassini testified at his deposition:

Q.     Did you do any research in this case on the history of the design of commercial food equipment?

A.     No.

Q.     Did you do any work in this case on the history of the design of commercial food mixers?

A.     No.

Q.     Did you look at the underwriter's laboratories' work for commercial food mixers?

A.     No.

Q.     Did you look at the National Sanitation Foundation requirements for commercial food mixers?

A.     No.

Q.     Can you tell me who Hobert['s] . . . competitors were back in 1982?

A.     No, I cannot.

(Bassani Dep. at 35.)

. . . .

Q.     Can you identify for me any commercial food mixer that had a bowl guard in 1982?

A.     No, I cannot.

(<u>Id.</u> at 36.)

. . . .

Q.     Do you know what sanitation issues were involved and had to be overcome in terms of designing the add-on bowl guard?

A.     Not specifically.

(<u>Id.</u> at 45.)

. . . .

Q.     Can you tell me what research, if any, you did that would suggest that any manufacturer of a commercial food mixer would have had a reason to put a bowl guard on prior to 1982?

A.     No.

Q.    Are you aware of any bowl guard that was available in 1982?

A.    Not at this moment.

(Id. at 56-57.)  For the foregoing reasons, we conclude that Bassani's methodology is unreliable under Rule 702.

## C. Assist the Trier of Fact

The third element under Rule 702, namely, whether the expert testimony would assist the trier of fact, "goes primarily to relevance."  Lauria v. Amtrak, 145 F.3d 593, 599 (3d Cir. 1998), quoting Daubert, 509 U.S. at 591.  The expert's testimony must "fit" under the facts of the case so that "it will aid the jury in resolving a factual dispute."  Id.  The standard for the factor is not high; it is met when there is a clear "fit" connecting the issue in the case with the expert's opinion that will aid the jury in determining an issue in the case.  Lauria, 145 F.3d at 600, quoting Paoli, 35 F.3d at 745.  "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."  Id., citing Daubert, 509 U.S. at 591-92.  In other words, expert testimony based on assumptions lacking factual foundation in the record is properly excluded.   Meadows, 306 Fed. Appx. at  790.

Here, for the same reasons stated above in finding Dr. Bassani's methodology to be unreliable, we find that his testimony would not assist the trier of fact.[7]  Thus, Dr. Bassani's opinion is excluded from evidence.[8]  We now move on to the Motion for Summary Judgment.

_____

[7]Likewise, for the same reasons, we find that Dr. Bassani's opinion that the mixer was also defective because it failed to have a warning alerting operators that it was dangerous while the agitator was moving to be unreliable as well, and thus, also excluded from evidence.

[8]Plaintiff has not requested a Daubert hearing, and we find  that a hearing would not aid in the disposition of Hobert's Motion.  A hearing is not required where the record is "sufficient to allow an inquiry under Daubert."  Oddi, 234 F.3d at 153.  Here, Bassani's report and his

## III.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) states that summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." See Hines v. Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991). The Court asks "whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" Compton v. Nat'l League of Prof'l Baseball Clubs, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond

---

deposition transcript afford sufficient insight into his methodology and how he arrived at his conclusions, and therefore obviate any need for a hearing. Id.; see also, e.g., Feit v. Great-West Life & Annuity Ins. Co., 460 F. Supp. 2d 632, 637-38 (D. N.J. 2006) (declining to hold a hearing when the relevant issues had been briefed and the court had been provided with deposition transcripts showing "that the [p]laintiff's experts . . . had ample opportunity to respond to [d]efendant's challenges to their conclusions, analyses and methodologies, and to explain their methods and opinions").

the allegations set forth in its pleadings and counter with evidence that presents "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992). "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a summary judgment motion. Tziatzios v. United States, 164 F.R.D. 410, 411-12 (E.D. Pa. 1996). If the court determines that there are no genuine issues of material fact, then summary judgment will be granted. Celotex, 477 U.S. at 322.

## IV.    DISCUSSION

### 1. Strict Products Liability

In Webb v. Zern, 220 A.2d 853, 854 (Pa. 1966), the Pennsylvania Supreme Court adopted § 402A of the Restatement (Second) of Torts as the law of strict products liability in Pennsylvania.[9]  The Court subsequently established that § 402A "imposes strict liability in tort not only for injuries caused by the defective manufacture of products, but also for injuries caused by defects in their design."  Lewis v. Coffing Hoist Div., Duff-Norton Co., 528 A.2d 590, 592

---

9. Section 402A of the Restatement (Second) of Torts (1965) provides that:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer . . . is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

> (2) The Rule stated in subsection (1) applies although (a) the seller has exercised all possible care in the preparation and sale of his product, and (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

(Pa. 1987).  In order to bring a products liability action in Pennsylvania, a plaintiff must

demonstrate that: (1) the product was defective; (2) the defect existed while the product was in

the control of the manufacturer; and (3) the defect was the proximate cause of the plaintiff's

injuries.  Walton v. Avco Corp., 610 A.2d 454, 458-59 (Pa. 1992)

Hobert asserts that without expert testimony, a reasonable jury could not find from this

evidence that the mixer contained a manufacturing or design defect that caused Shannon's

injuries.  We agree.  In addition, we find that even if we did not exclude Shannon's expert's

opinion, Shannon would still not be able to withstand a Motion for Summary Judgment on this

record.  We first note that Hobert has produced an expert opinion from an engineer who has

worked as a Product Design Policy Manager in the food industry since 1987, and has extensive

knowledge of the mixer in question.  (Defs.' Mot. Summ. J., Ex. B.)  Specifically, Hobert's

expert, John Kelly ("Kelly"), opined that the mixer was not defective at the time it was

manufactured, and that in 1982 an "interlocked guard had not been invented due to the

complexities related to ensuring proper function and ease of sanitation of the mixer."[10]  (Id.)

Most significant, however, is the fact that both Dr. Bassani and Shannon acknowledge in

their depositions that the mixer is not dangerous if used correctly.  Each testified that it is

---

[10]Kelly stated in an affidavit that the M-802 mixer was designed with safety features to prevent inadvertent activation.  (Defs.' Mot. Summ. J., Ex. C at ¶ 6.)  Kelly further stated that multiple steps are also required before the mixer's agitator's will rotate.  For example, the start button must be pressed, the clutch lever must be moved to the run position, and the timer must be set.  (Id. at ¶ 7.)  Kelly added that the mixer's design met all safety standards set forth by Underwriter's Laboratories Inc. ("UL") and the National Sanitation Foundation ("NSF"), and the relevant independent entities in the commercial food equipment industry that evaluate, test, and certify product designs for safety and sanitation.  (Id. at ¶ 15.)

obvious that it would be dangerous for a person to place any body part in the mixer bowl while it was running, and that it was obvious that a person should not turn on the mixer when another person had his or her head in the mixer's bowl as was the case here.

Shannon testified:

> Q.  Did you know not to put any part of your body in [the bowl] while it was moving?
>
> A.  Absolutely.

(Shannon Dep. at 60.)  In addition, Dr. Bassani testified:

> Q.  Would you agree that it's obvious that you don't want to put your head in the bowl if the agitator with the dough hook is moving?
>
> A.  I agree.

(Bassani Dep. at 44.)

> . . . .
>
> Q.  Would you also agree that if someone's head was somehow inside the bowl near the dough hook, it would be obvious that someone shouldn't turn the machine on at that point?
>
> A.  Yes.

(Id. 48-49.)  Furthermore, it is apparent from this testimony from Shannon that she cannot establish that the mixer was defective for failure to warn that the mixer was dangerous while running because she was aware of the danger.  In addition, Shannon testified that Rodriguez was aware of the danger as well.  Shannon stated that she specifically instructed Rodriguez that once the mixer was shut off and a person was extracting food from the bowl that nothing on the

machine should be touched.[11]  (Shannon Dep.at 79.)  It is well-established under Pennsylvania

law that a manufacturer has no duty to warn of a danger where such danger is open and obvious,

there is no duty to warn.  See  Fleck v. KDI Sylvan Pools, Inc., 981 F.2d 107, 119 (3d Cir. 1992);

Blake v. Greyhound Lines, Inc., 448 F. Supp. 2d 635, 641 (E.D. Pa. 2006).  Thus, because both

Shannon and Rodriguez were both aware of the danger, and because such danger was open and

obvious, Shannon's failure to warn claim fails.

Moreover, Shannon acknowledged that she was injured not because the mixer was

defective as designed, but that she was essentially injured by the negligent or even intentional act

of Rodriguez.  Shannon does not assert that the agitator in the mixer somehow started to operate

by itself while her head was in the bowl, but rather that Rodriguez turned it on after the mixer

had been completely turned off.  Shannon corroborated Kelly's assertion that the mixer would

only be able to operate when three steps are taken: the mixer is turned on; the clutch lever is

moved to the on position; and the timer is turned on.  Shannon testified as to this and

Rodriguez's actions when her head and body were in the bowl:

> Q.  Miss Shannon, we just took a real short break.  I want you to
> walk me through after the dough finished mixing at either seven to
> nine minutes, whatever you instructed Miss Rodriguez to do, walk
> me through the sequence of what happened next.  What did she do?

---

[11]Shannon testified:

> Q.  Did you also instruct her [Rodriguez] that once that happened [the stop button
> was hit, the timer was off, and the clutch moved to the off position] and someone
> moved their body in to remove the dough, nothing else should be touched?
> A.  Absolutely.

(Shannon Dep. at 79.)

A.  She hit the stop button, made sure the timer was off, and moved the clutch to the off position.

Q.  Then what did she do?

A.  She lowered the bowl.

Q.  And then what?

A.  And then I was reaching in to scoop the dough out.

(Shannon Dep. at 77-78.)

. . . .

Q.  Did you actually see her hit the stop button?

A.  Yes.

Q.  Did you see her turn the timer off?

A.  Yes.

Q.  Did you see her mover the clutch to off?

A.  Yes.

Q.  And you saw her lower the bowl?

A.  Yes.

(Id. at 78-79.)

. . . .

Q.  What happened next as you were trying to remove the dough? Had you taken any of it out yet?

A.  No.  I was just - - I just got my hands in there to scoop it out, and next thing you know I was on the floor.

Q.  Did you see her do anything?      A.  She was standing right here next to me.  The bowl was right in front of me.  I was scooping.  There wasn't anyone else around me, and I guess she turned the clutch to speed one or two or something while I was in there.  Like I said, next thing I remember, I was on the ground.

(Id. at 79-80.)

As noted earlier, summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. For the reasons discussed above, we conclude that is no genuine issue of material fact as to Shannon's claim that the mixer was defective and the cause of her injuries.[12]

## 2. Negligence

Lastly, Shannon has claimed a cause of action for negligence. A negligence claim may stand even in the absence of a "defect" under strict liability principles. Hittle v. Scripto-Tokai Corp., 166 F. Supp. 2d 142, 152 (M.D. Pa. 2001); Griggs v. BIC Corp., 981 F.2d 1429 (3d Cir. 1992). A prima facie negligence claim requires the plaintiff to show that: (1) the defendant had a duty to conform to a certain standard of conduct; (2) the defendant breached that duty; (3) such breach caused the injury in question; and (4) the plaintiff incurred actual loss or damage. Krentz v. Consol. Rail Corp., 910 A.2d 20, 27-28 (Pa. 2006).

In addition, in Pennsylvania, foreseeability is a legal requirement before recovery can be had. See Griggs v. BIC Corp., 981 F.2d 1429, 1435 (3d Cir. 1992) (foreseeability is integral part of determination that duty exists under Pennsylvania negligence law) (citing Carson v. City of Philadelphia, 574 A.2d 1184, 1187 (1990)). "The test of negligence is whether the wrongdoer

_____

[12]Shannon has also averred a claim for breach of warranty. The standards of § 402A of the Restatement (Second) of Torts apply to breach of warranty as well as strict liability. Kridler v. Ford Motor Co., 422 F.2d 1182, 1184 (3d Cir. 1970). The elements of proof required to demonstrate breach of warranty are similar to those required to establish a strict liability action. Simeone v. Bombardier-Rotax GMBH, 360 F. Supp. 2d 665, 680 n. 5 (E.D. Pa. 2005). We find that for the same reasons that we granted summary judgment for strict products liability, we do so also for breach of warranty.

could have anticipated and foreseen the likelihood of harm to the injured person, resulting from his act." Id.; see also Kleinknecht v. Gettysburg College, 989 F.2d 1360, 1369 (3d Cir. 1993).

Here, it is not reasonably foreseeable that someone would press the mixer's start button, move the clutch lever to the run position, and set the timer while someone else's upper body and head were in the bowl. Thus, Shannon's negligence claim fails as a matter of law, and accordingly, summary judgment is granted as to all Shannon's causes of action.[13]

An appropriate Order follows.

---

[13]In addition, Hobert's Motion In Limine to Exclude the Testimony and Opinions of Carolyn C. Uveges, Lorraine E. Buchanan, and David L. Hopkins is denied as moot in light of our granting of their Motion for Summary Judgment.